# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| NPC INTERNATIONAL, INC.<br><br>        Plaintiff,<br><br>vs.<br><br>VISA, INC.; VISA U.S.A., INC.; VISA INTERNATIONAL SERVICE ASSOCIATION; MASTERCARD INCORPORATED; and MASTERCARD INTERNATIONAL, INCORPORATED,<br><br>        Defendants. | Civil Action No. 15-CV-4734<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page(s)**

I.     **INTRODUCTION** ................................................................................... 1

II.    **JURISDICTION AND VENUE** ............................................................ 9

III.   **DEFINITIONS** ...................................................................................... 9

IV.   **PLAINTIFF** ......................................................................................... 15

V.    **DEFENDANTS** .................................................................................... 16

VI.   **CO-CONSPIRATORS** ....................................................................... 17

VII.  **THE RELEVANT GEOGRAPHIC MARKET** ................................... 18

A.    The Relevant Market for Merchant Acceptance of Credit Cards .................................... 19

B.    The Relevant Sub-Market for Merchant Acceptance of Visa Credit Cards .................... 20

C.    The Relevant Sub-Market for Merchant Acceptance of MasterCard Credit Cards ......................................................................................................... 20

D.    The Relevant Market for Merchant Acceptance of Debit Cards .................................... 21

VIII. **DEFENDANTS' COMBINATIONS AND CONSPIRACIES** ................................... 21

A.    The Period Preceding the Corporate Restructurings of Visa and MasterCard ................ 21

B.    The Visa and MasterCard IPOs and the Continuation of their Combinations and Conspiracies Post-IPO .............................................................. 23

IX.   **THE EFFECTS OF THE COMPETITIVE RESTRAINTS** ..................................... 26

A.    The Establishment of "Default" Interchange Fees ........................................................ 28

B.    The Past (and Continuing) Effects of the "Honor All Cards" and "No-Multi-Issuer" Rules ........................................................................... 30

C.    The Effects of the "All Outlets," "No Discount" and "No Surcharge" Rules ................ 32

X.    **MARKET POWER** ............................................................................. 33

A.    Visa's Market Power in the Market for Merchant Acceptance of Credit Cards and Visa's Market Power in the Sub-Market for Merchant Acceptance of Visa Credit Cards ................................................ 33

i

B.      MasterCard's Market Power in the Market for Merchant Acceptance of
        Credit Cards and MasterCard's Market Power in the Sub-Market for
        Merchant Acceptance of MasterCard Credit Cards................................................35

C.      Defendants' Market Power in the Market for Merchant Acceptance of Debit
        Cards ....................................................................................................................37

**XI.    COMPETITIVE INJURY**................................................................................................38

**XII.   CLAIMS FOR RELIEF**..................................................................................................39

A.      Count 1 Against Visa for Violation of Section 1 of the Sherman Act by
        Visa's Competitive Restraints Governing Credit Cards.......................................39

B.      Count 2 Against Visa for Violation of Section 1 of the Sherman Act by
        Visa's Competitive Restraints Governing Debit Cards........................................42

C.      Count 3 Against Visa for Violation of Section 2 of the Sherman Act by
        Visa's Monopolization of the Market for Merchant Acceptance of Credit
        Cards ....................................................................................................................45

D.      Count 4 Against Visa for Violation of Section 2 of the Sherman Act by
        Visa's Monopolization of the Sub-Market for Merchant Acceptance of Visa
        Credit Cards .........................................................................................................46

E.      Count 5 Against MasterCard for Violation of Section 1 of the Sherman Act
        by MasterCard's Competitive Restraints Governing Credit Cards.....................47

F.      Count 6 Against MasterCard for Violation of Section 1 of the Sherman Act
        by MasterCard's Competitive Restraints Governing Debit Cards......................49

G.      Count 7 Against MasterCard for Violation of Section 2 of the Sherman Act
        by MasterCard for Monopolization of the Market for Merchant Acceptance
        of Credit Cards.....................................................................................................52

H.      Count 8 Against MasterCard for Violation of Section 2 of the Sherman Act
        by MasterCard for MasterCard's Monopolization of the Sub-Market for
        Merchant Acceptance of MasterCard Credit Cards.............................................53

I.      Count 9 Against all Defendants for Violations of State Antitrust and Unfair
        Competition Laws ................................................................................................54

**XIII.  DAMAGES**....................................................................................................................56

**XIV.   DEMAND FOR JURY TRIAL**.....................................................................................56

**XV.    PRAYER FOR RELIEF**................................................................................................56

Plaintiff NPC International, Inc. (here, "Plaintiff" or "NPC") brings this action for damages and injunctive relief under the antitrust laws of the United States, and under the antitrust and unfair competition laws of the states of Florida, Iowa, Kansas, Minnesota, Mississippi, North Carolina, North Dakota, Oregon, South Dakota, Tennessee and West Virginia against the defendants named below and demands a trial by jury, and complains and alleges as follows:

## I.      INTRODUCTION

1.      This action is brought against Visa, Inc., Visa U.S.A., Inc. and Visa International Service Association (collectively, "Visa") and MasterCard Incorporated and MasterCard International Incorporated (collectively, "MasterCard"), the dominant payment card networks in the United States.

2.      Plaintiff seeks damages for the period from January 1, 2004 through at least January 27, 2013 or until such time as the effects of the defendants' prior unreasonable restraints of trade ceased (the "Relevant Time Period"). Unless context dictates otherwise, all allegations relate to conduct during the Relevant Time Period.

3.      Plaintiff also seeks injunctive relief for defendants' continued imposition of the "Honor All Cards" and "No-Multi-Issuer" Rules (as those phrases are defined below), which continue to damage Plaintiff in its business and property.

4.      During the Relevant Time Period, Visa and MasterCard each implemented, managed, coordinated and governed a combination and conspiracy in unreasonable restraint of trade within the meaning of the Sherman Antitrust Act, 15 U.S.C. §1, and each of the state antitrust and unfair competition laws listed above. Each combination and conspiracy – the Visa combination and conspiracy and the MasterCard combination and conspiracy – had as its members the vast majority of banks or other financial institutions that issued credit or debit cards in the United States. The

1

phrase "member banks" is used here to describe the banks who are members of Visa and/or MasterCard, who Plaintiff alleges to be co-conspirators in the defendants' illegal combinations and conspiracies. The overwhelming majority of the banks and financial institutions that were members of Visa were also members of MasterCard, and those entities issued both Visa- and MasterCard-branded credit and debit cards. These member banks were independently-owned and managed entities that competed to issue credit and debit cards to consumers. Yet, through their membership in, and agreement to abide by the rules of defendants Visa and MasterCard, each member bank agreed not to compete for merchant acceptance of the credit and debit cards that it issued.

5.     As detailed below, the relevant markets in this action are: the market for merchant acceptance of credit cards; two sub-markets of the market for merchant acceptance of credit cards, namely the sub-market for merchant acceptance of Visa credit cards and the sub-market for merchant acceptance of MasterCard credit cards; and the market for merchant acceptance of debit cards. In violation of Section 2 of the Sherman Act, during the Relevant Time Period, Visa monopolized the relevant market for merchant acceptance of credit cards and the relevant sub-market for merchant acceptance of Visa credit cards. In violation of Section 2 of the Sherman Act, during the Relevant Time, Period MasterCard monopolized the relevant market for merchant acceptance of credit cards and the relevant sub-market for merchant acceptance of MasterCard credit cards.

6.     There are two types of payment cards at issue in this action: credit cards and debit cards (as those phrases are defined below in Paragraph 20). Issuing banks earn income on credit cards through fees and charges to the cardholder – primarily interest on the account balance for credit cards – and from the fees and penalties that accompany late payment of card balances.

Issuing banks earn income on debit cards by taking the opportunity to use the funds a cardholder maintains in his or her account and on various fees associated with the cardholder's bank account. Importantly, issuing banks also earn income on credit and debit cards through the interchange fees paid by merchants. Interchange fees were imposed on merchants by Visa and MasterCard for the privilege of accepting an issuing bank's cards from consumers as a means of payment. These fees were collected from the merchant and paid to the issuers of the cards. The profitability to issuing banks of credit and debit cards directly increases with the size and frequency of transactions in which the cards are used.

7.     Banks that are members of Visa and MasterCard compete with each other in the issuance of credit and debit cards to consumers. For example, issuing banks offer cards with various combinations of interest rates, annual fees, cash-back and other rewards, and other features to compete for cardholders and to induce cardholders to use their payment cards.

8.     Visa and MasterCard adopted nearly identical rules, which their member banks agreed to impose on merchants that accepted payment cards issued by those banks. These rules – the "Competitive Restraints," as defined and detailed below – eliminated competition among Visa and MasterCard member banks for merchant acceptance of credit and debit cards. Because the members of Visa and MasterCard included nearly all payment card issuers in the United States, and because those card issuers agreed to a set of rules that barred them from independently competing for merchant acceptance of credit and debit cards, Visa and MasterCard and their members obtained and maintained market power in the market for merchant acceptance of credit cards in the United States, as well as the market for merchant acceptance of debit cards in the United States. In addition, Visa obtained and maintained market power in the sub-market for merchant acceptance of Visa credit cards, and MasterCard obtained and maintained market power

in the sub-market for merchant acceptance of MasterCard credit cards.  The exercise of this market power caused merchants to pay excessive interchange fees.  The Competitive Restraints enforced by Visa and MasterCard, and the actions taken in furtherance of these restraints, constituted combinations and conspiracies in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

9.    The primary rules that made up the Competitive Restraints were: the setting of "default" interchange fees; the "Honor All Cards Rules;" the "No-Multi-Issuer Rules;" the "All-Outlets Rules;" the "No Discount Rules;" and the "No Surcharge Rules."  These rules precluded merchants from gaining the benefits of competition as to the terms for acceptance of cards of particular issuing banks, and precluded card issuers from competing for merchant acceptance of their cards.  Because of their participation in the Competitive Restraints through their membership in Visa and MasterCard, issuing banks did not compete for transaction volume by independently competing for merchant acceptance.  As a result, the setting of "default" interchange fees fixed the price of card acceptance at a supra-competitive level.  Plaintiff paid significantly higher costs to accept Visa- and MasterCard-branded credit and debit cards than it would have if the member banks issuing those cards had actually competed for merchant acceptance.

10.    Visa and MasterCard, on behalf of their co-conspirator member banks, exploited their market power in the market for merchant acceptance of credit cards (and the two sub-markets for merchant acceptance of Visa credit cards and merchant acceptance of MasterCard credit cards), as well as the market for merchant acceptance of debit cards, by creating interchange fee "schedules" (*i.e.*, price lists) that were designed to increase the amount of interchange income issuing banks were able to extract from merchants.  While Visa and MasterCard referred to these schedules as "default" interchange fee schedules – implying that it would be possible for issuing banks and

merchants to obtain different interchange rates by entering into bi-lateral acceptance agreements – the Competitive Restraints prevented such agreements from taking place. The Competitive Restraints also eliminated the ability of members of Visa and MasterCard to compete for merchant acceptance through setting low "default" interchange fees. By setting and enforcing supra-competitive interchange fees applicable to various types of merchants that accepted cards issued by their members, Visa and MasterCard exercised the market power gained by their combinations and conspiracies.

11. During the Relevant Time Period, judicial efforts to reign in the exercise of market power by the Visa and MasterCard combinations were largely ineffective. In 2003, the so-called "exclusivity" rules of both Visa and MasterCard – which barred member banks from issuing cards on competing networks such as American Express or Discover – were declared unlawful in the wake of a civil lawsuit by the United States Department of Justice. *See United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003) ("*U.S. v. Visa*"). Shortly thereafter, relieved of this particularly restrictive rule, a number of Visa and MasterCard member banks, including MasterCard member bank MBNA (since merged with Bank of America, N.A.) began to issue American Express cards. In 2003, as part of a class action settlement in *In re Visa Check/Master Money Antitrust Litigation*, Civil Action No. 96-cv-5238 (E.D.N.Y.) ("*Visa Check*"), Visa and MasterCard agreed to stop using the "Honor All Cards" Rules to tie credit card acceptance and debit card acceptance. Yet the outcomes of *U.S. v. Visa* and *Visa Check* did not diminish Visa's and MasterCard's power to dictate price and prevent competition. Indeed, immediately after the two lawsuits mentioned above, both Visa and MasterCard increased the credit card interchange fees extracted from merchants. The debit card interchange fees they imposed after these lawsuits were later found by the Federal Reserve Board (the "FRB") to be

5

significantly above cost.  Moreover, while the <u>tie</u> between credit card acceptance and debit card acceptance was discontinued after *Visa Check*, the "Honor All Cards" Rules remain in effect for credit cards and debit cards separately, and continue to be enforced.

12.   In 2008, in response to a Department of Justice investigation, Visa withdrew its short-lived rule limiting merchants' ability to accept PIN debit cards.  In July 2011, in a settlement with the Justice Department, both Visa and MasterCard amended their rules to allow merchants to offer discounts to customers in broader circumstances than previously allowed (*e.g.*, whereas certain types of merchants, such as gas stations, were historically allowed to discount for cash transactions, the 2011 settlement with the Justice Department extended the exemptions to allow merchants to offer discounts to cardholders paying with cards imposing lower interchange rates).  However, again, these two changes did not diminish the combinations' market power, or lead to a reduction in the interchange fees that merchants paid.  Instead, interchange fees continued to increase during the Relevant Time Period.

13.   As part of the so-called Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2011, 15 U.S.C. 1693o-2 (the "Durbin Amendment"), the FRB was mandated to set a maximum level for interchange fees that large banks could impose on debit card transactions, and eliminated the long-standing (and outdated) distinction between the fees merchants paid for "signature" (also called "offline") debit transactions (whose interchange rates are comparable to credit card interchange rates) and PIN (also called "online") debit transactions (which had historically had significantly lower interchange rates than signature debit transactions). The maximum fee set by the FRB's action – which, importantly, did <u>not</u> apply to either credit cards, nor the roughly one-third of debit cards issued by smaller banks not subject to FRB regulation – was significantly below the then-existing interchange levels established by Visa and

MasterCard for debit card transactions.  The FRB did not prohibit debit or credit card interchange rates from being set below this maximum level (although, upon information and belief, during the period while this cap was in place, no issuing bank set its rates below the level dictated by the FRB).  The Durbin Amendment also mandated that the FRB issue regulations prohibiting issuing banks and debit networks such as Visa and MasterCard from "restricting the number of payment card networks on which an electronic debit transaction may be processed" to one network or multiple affiliated networks.  These so called "network non-exclusivity" regulations were intended to (1) curtail the anti-competitive effects of the "No-Multi-Issuer" Rules in the market for merchant acceptance of debit cards, and consequently (2) inject price competition into that market by giving merchants the flexibility to route transactions over the network that would result in the lowest cost to the merchant.

14.  In 2011, a group of merchants and trade associations sued the FRB, alleging that its maximum debit interchange fee rule and network non-exclusivity rules did not comply with the intent of the Durbin Amendment.  In 2013, the district court held that the FRB's rulemaking on the network non-exclusivity portion of the Durbin Amendment was contrary to a clear Congressional intent "to put an end to exclusivity agreements and increase merchants' choice among debit-processing networks, not restrict that choice or even preserve the status quo," staying the FRB's rules pending appellate review.  In 2014, the D.C. Court of Appeals overturned the district court's decision, upholding most of the challenged rules and remanding the issue back to the FRB for "further explanation."  While the Supreme Court denied the merchants' petition for *certiorari* in early 2015, the Durbin rules are currently within the FRB's jurisdiction and any forthcoming rulemaking may be challenged again.  As such, the ultimate fate of the FRB's rules is unclear.

15. If freed of the imposition of "default" interchange fees and the Competitive Restraints, issuing banks and merchants would have operated in competitive markets for merchant acceptance of credit cards and merchant acceptance of debit cards; merchants would have benefitted from competition among issuing banks as to interchange fees that all merchants must pay in order to accept payment cards.

16. Collective rate-setting allowed issuing banks to charge interchange fees far in excess of the issuing banks' costs (which have, as a general matter, steadily declined even as interchange rates continually increased during the Relevant Time Period). In competitive markets, interchange fees would have moved to competitive levels, and the interchange fees Plaintiff paid would have been significantly below the amounts it has paid since January 1, 2004. If merchants had the ability to use competitive strategies with respect to their acceptance of the payment cards of individual issuers, they would have induced competition among issuing banks – which would in turn have led to lower interchange fees. But that was not the reality during the Relevant Time Period.

17. During the Relevant Time Period, NPC paid tens of millions of dollars in credit and debit interchange fees to issuing banks that were members of the Visa and MasterCard combinations and conspiracies. Interchange fees are generally one of a merchant's largest operating expenses, often eclipsing other overhead costs such as energy and rent. Elimination or modification of the Competitive Restraints, and restoration of competitive markets for merchant acceptance of credit and debit cards, would have substantially reduced interchange fees, allowing Plaintiff to operate more efficiently and at lower costs, to the benefit of consumers. Plaintiff operated in intensely competitive markets and would have used the savings from a reduction in its interchange costs to increase its competitiveness by enhancing the value NPC's customers received from Plaintiff's goods and services.

## II.        JURISDICTION AND VENUE

18.   This action is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to enjoin violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, for damages for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.  This Court has jurisdiction over Plaintiff' federal antitrust claims under 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff' state antitrust and unfair competition law claims under 28 U.S.C. § 1367.

19.   Venue is proper in the U.S. District Court for the Eastern District of New York under Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and under 28 U.S.C. § 1391, as defendants reside in, are found in, have agents in, and transact business in this district. Moreover, thousands of merchants are located in the Eastern District of New York and accept Visa- and MasterCard-branded credit cards and debit cards issued by one or more of the Visa and MasterCard member banks.  A substantial part of the interstate trade and commerce involved and affected by the alleged antitrust violations was, and continues to be, carried on within the Eastern District of New York.  Accordingly, the acts complained of have had, and will have, substantial anti-competitive effects in this district.

## III.        DEFINITIONS

20.   As used in this Complaint, the following definitions apply:

   a.    "**Credit cards**" are payment cards allowing the cardholder to buy goods or services
      from any merchant that has an agreement to accept such cards; credit cards, as
      defined here, also include charge cards, which allow cardholders to obtain goods or
      services with a grace period before the cardholder has to pay his or her balance in
      full.  The credit cards at issue in this action are payment cards, as distinguished
      from "private label" cards, which can only be used at a single merchant.  Payment

to a merchant for the goods or services bought with a credit card is made by the bank issuing the card on behalf of the cardholder, with repayment by the cardholder subject to an agreement between that cardholder and the issuing bank. Credit cards allow a cardholder to obtain goods or services from a merchant on credit, with the credit provided by the card issuer. Credit card issuers compete for cardholders by offering a range of terms (*e.g.*, interest rates, late fees) and types of cards (*e.g.*, cash-back or rewards points) that vary between cards, with the issuing banks using the terms and types of cards to induce consumers to sign up for and use their cards. Credit cards (other than charge cards) allow consumers to effectively borrow the money for a purchase from the card-issuing bank (indeed, issuing banks typically describe their credit-card portfolios as "loans") and repay the debt over time, pursuant to the provisions of a revolving-credit agreement between the cardholder and the issuing bank. Cards with higher levels of rewards are generally called "premium" cards, and carry higher interchange rates even though they afford no additional benefits to merchants and do not cost more to process than non-"premium" (or "traditional") cards.

b. "**Debit cards**" are payment cards that allow holders of accounts at banks to pay for goods or services (or obtain cash) by directly accessing their accounts. Debit cards also include pre-paid cards, which require a prepayment of the amount that the card user can draw from. There are two ways to authenticate debit cards: "PIN" debit cards require the cardholder to enter a numeric code (a "personal identification number") to authenticate the cardholder; "signature" debit cards typically require the cardholder's signature at the time of the transaction. In the 1980s, certain PIN

debit cards did not carry an interchange fee, or were subject to so-called "reverse interchange" (where the merchant, not the issuer, received a fee for card acceptance). Signature debit cards generally carry higher interchange fees than PIN debit cards, and in many instances equal the interchange fees charged for credit card transactions. Debit cards are regulated separately, and differently, from credit cards. In 2011, the FRB set the maximum debit interchange fees for banks regulated by the FRB at $0.21 plus 0.05% (plus an additional $0.01/transaction for fraud prevention costs for eligible issuers), or an average of $0.23 - $0.24 per debit transaction. These regulated rates were less than half of the signature debit interchange fees previously set by Visa and MasterCard, which averaged $0.58 and $0.59 per transaction, respectively, for the same set of issuers that ultimately became subject to the FRB's maximum debit interchange fee cap. However, as alleged above, the ultimate fate of the maximum debit interchange rate imposed by the FRB, as well as the FRB's "network non-exclusivity" regulations (described above in Paragraphs 13 – 14) is unclear.

c.   An "**issuing bank**" is a member of Visa or MasterCard that issues credit or debit cards to cardholders. Most issuing banks are members of both Visa and MasterCard, and compete with one another to issue cards to potential cardholders.

d.   An "**acquiring bank**" is a member of Visa or MasterCard that "acquires," or processes, purchase transactions from merchants. All acquiring banks are (and in fact, are required to be) members of Visa or MasterCard. As member banks, acquiring banks serve as gatekeepers, ensuring that: card transactions are routed over the Visa or MasterCard networks; that the interchange fees set by Visa and

MasterCard are paid on all transactions; and that merchants abide by the rules imposed by Visa and MasterCard. Acquiring banks compete with one another for the acquisition of merchants' business.

e.  "**Network services**" include, among other things, the services of authorization, clearance and settlement of payment card transactions that the members of Visa and MasterCard have delegated to the networks to provide on the members' behalf. Authorization, clearance and settlement refer to the process by which payment card transactions are completed.

f.  "**Interchange fee**" is the fee that issuing banks receive, and merchants pay, when merchants accept a credit card or debit card issued by a member of Visa or MasterCard. Interchange fees account for the largest portion of merchant costs for accepting such cards. Under the agreements by and among Visa and its member banks, and by and among MasterCard and its member banks, the so-called "default" interchange fees are established and published by Visa and MasterCard, respectively, and the payment of interchange fees (and other corollary rules) is enforced through the acquiring banks.

g.  "**Merchant discount**" is the term used to describe the total amount of fees and other costs deducted from the original transaction amount. The merchant discount includes the interchange fee, and the merchant discount is never less than the interchange fee established by the Visa and MasterCard combinations.

h.  "**Competitive Restraints**" mean the following rules, created by the Visa member banks and the MasterCard member banks and adopted (in nearly-identical form) by the Visa and MasterCard networks, and imposed on merchants by the Visa member

banks and the MasterCard member banks during the Relevant Time Period (unless otherwise noted):

i. The "Honor All Cards" Rules: require, in relevant part, that a merchant that accepts any Visa- or MasterCard-branded payment card must also accept all Visa- or MasterCard-branded payment cards, no matter the card type (*e.g.*, "traditional" or "premium") and regardless of the member bank that issues the card.  The "Honor All Cards" Rules were not eliminated pursuant to the settlement in the *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL-1720 (E.D.N.Y.) (the "*Payment Card*" Action).  The "Honor All Cards" Rules are still in effect, and currently operate in essentially the same manner as they did during the Relevant Time Period.

ii. The "No-Multi-Issuer" Rules: prohibit a Visa- or MasterCard-member bank from issuing a card that processes a transaction routed over another card network (*i.e.*, a Visa member bank cannot issue a card that would be capable of processing <u>either</u> a Visa transaction <u>or</u> a MasterCard transaction, and a MasterCard member bank cannot issue a card that would be capable of processing <u>either</u> a MasterCard transaction <u>or</u> a Visa transaction – such a card can be either a Visa-branded payment card or a MasterCard-branded payment card, but cannot be both).  Visa and MasterCard issuers cannot issue a payment card that would allow a merchant to route a given transaction over whichever network may be cheapest (*i.e.*, would charge the merchant the lowest interchange fee), because the "No-Multi-Issuer" Rules

13

prohibit such a transaction from even taking place. The "No-Multi-Issuer" Rules were not eliminated pursuant to the settlement in the *Payment Card* Action. While the rules promulgated under the Durbin Amendment may ultimately remedy the effect of the "No-Multi-Issuer" Rules for debit cards, the "No-Multi-Issuer" Rules are still in effect for credit cards, and currently operate in the same manner as they did during the Relevant Time Period.

iii.   The "All Outlets" Rules: required merchants who accepted Visa- or MasterCard-branded payment cards to accept those cards at all of their locations, even if that location operated under a different trade name or banner; a merchant was not allowed to accept such payment cards at some banners or trade names but not others. Pursuant to the settlement in the *Payment Card* Action, defendants Visa and MasterCard discontinued the "All Outlets" Rules applicable to credit cards on or about January 27, 2013.

iv.   The "No-Discount" Rules: mandated that merchants were only allowed to offer their customers a "form-of-payment discount," that only allowed merchants to offer customers a discount for paying in cash (as opposed to a discount for paying with a certain type of payment card). The "No-Discount" Rules were in effect for most of the Relevant Time Period. On July 20, 2011, as part of the resolution of a civil action brought against them (and American Express) by the United States Department of Justice, defendants Visa and MasterCard removed the "No-Discount" Rules from their standard merchant agreements, and revised those standard merchant agreements to allow merchants to (among other things), offer a customer an

immediate discount for paying with an alternate payment card and to inform their customers about Visa's and MasterCard's transaction fees.

v.   <u>The "No-Surcharge" Rules</u>: prohibited merchants from surcharging transactions in which a customer used a Visa- or MasterCard-branded payment card.   Pursuant to the settlement in the *Payment Card* Action, defendants Visa and MasterCard discontinued the "No-Surcharge" Rules applicable to credit cards on or about January 27, 2013, but there are many conditions imposed on this part of the settlement, and it is unclear exactly what surcharges are currently permitted.   In addition, the final approval of the settlement in the *Payment Card* Action has been appealed, and as such, the ultimate fate of the "No-Surcharge" Rules has yet to be decided.

## IV.    PLAINTIFF

21.   Plaintiff NPC International, Inc. is a Kansas corporation headquartered in Pittsburg, Kansas.   During the Relevant Time Period, NPC has been (and still is) the largest franchisee of any restaurant concept in the United States, and is the country's eighth-largest restaurant unit operator, based on unit count.   NPC, which is also a significant franchisee of Wendy's, a trade name owned by The Wendy's Company, is the largest U.S. franchisee of Pizza Hut, a trade name owned by Yum! Brands, Inc. and licensed to NPC for use with respect to the operation and promotion of NPC's Pizza Hut restaurants.   NPC owned and operated 1,253 Pizza Hut locations in 28 states during the Relevant Time Period. ,  NPC owned and operated retail locations at which Visa- and MasterCard-branded credit and debit cards were accepted as payment for goods and services.   NPC has paid supra-competitive, artificially-inflated interchange fees to defendants and their co-conspirators, and sustained injury and damages as a result of the unlawful conduct of defendants and their co-conspirators.

22.    During the Relevant Time Period, NPC accepted Visa- and MasterCard-branded credit and debit cards.  Accordingly, Plaintiff was forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and were forced to pay supra-competitive interchange fees, all to Plaintiff's detriment.

23.    Plaintiff continues to accept Visa- and MasterCard-branded credit and debit cards, and continues to suffer injury in its business and property by virtue of the "Honor All Cards" Rules (for both credit and debit cards) and the "No-Multi-Issuer" Rules (for credit cards and, until such time as the FRB issues valid rules pursuant to the Durbin Amendment, for debit cards as well).

24.    Plaintiff timely and properly opted out of the Rule 23(b)(3) settlement class in the *Payment Card* Action finally approved by Judge Gleeson on December 13, 2013.

## V.    DEFENDANTS

25.    Until the corporate restructuring and initial public offering detailed below, defendant Visa International Service Association was a non-stock Delaware corporation headquartered in Foster City, California.  Defendant Visa U.S.A., Inc., a non-stock Delaware corporation, was a group-member of Visa International Service Association and headquartered in San Francisco. Visa U.S.A., Inc.'s members were the financial institutions acting as issuing and acquiring banks in the Visa network.

26.    Defendant Visa, Inc., a Delaware corporation based in Foster City, California, was created through a corporate reorganization begun in or around October, 2007 (and finalized on March 18, 2008, the date of Visa's initial public offering).  Visa U.S.A., Inc.'s member banks were the initial shareholders of Visa, Inc.; however, defendant Visa, Inc. is currently a publicly-held corporation.

27.    Defendants Visa, Inc., Visa U.S.A., Inc. and Visa International Service Association are referred to collectively as "Visa" in this Complaint.

16

28.   Defendant MasterCard Incorporated was incorporated as a Delaware stock corporation in May, 2001; it is headquartered in Purchase, New York.

29.   Defendant MasterCard International Incorporated was formed in late 1966 as a Delaware membership corporation whose principal or affiliate members were its financial institution issuing and acquiring banks.   Prior to the initial public offering detailed below, MasterCard International Incorporated was the principal operating subsidiary of MasterCard Incorporated.   Defendant MasterCard International Incorporated is still a wholly-owned subsidiary of MasterCard Incorporated and it also has its principal place of business in Purchase, New York.

30.   Defendants MasterCard International Incorporated and MasterCard Incorporated are referred to collectively as "MasterCard" in this Complaint.

## VI.   CO-CONSPIRATORS

31.   The member banks of Visa and MasterCard engaged in a conscious commitment to a common scheme to adopt and enforce the Competitive Restraints described in this Complaint, and each member bank was both a participant in, and beneficiary of, defendants' illegal combination and conspiracy, and are co-conspirators in defendants' illegal combinations and conspiracies.

32.   The fact that there were thousands of Visa and MasterCard member banks did not limit their ability and incentive to participate as co-conspirators in defendants' combinations and conspiracies.   As the Second Circuit held in *U.S. v. Visa* with respect to the member banks' collusive adoption and enforcement of the rules barring issuance of American Express and Discover cards, "these 20,000 [member] banks have agreed to abide by a restrictive exclusivity provision to the effect that in order to share the benefits of their association by having the right to issue Visa or MasterCard cards, they must agree not to compete by issuing cards of Amex or Discover.   The restrictive provision is a horizontal restraint adopted by 20,000 competitors."

17

## VII.     THE RELEVANT GEOGRAPHIC MARKET
## AND RELEVANT PRODUCT MARKETS

33.     Plaintiff alleges *per se* violations of the antitrust laws, and as such is not required to allege a relevant geographic or product market (or markets).  However, in the alternative, Plaintiff alleges the following relevant geographic and product markets.

34.     The relevant geographic market is the United States and its territories.  Visa and MasterCard, and their largest issuing banks, advertise nationally and pursue promotional strategies aimed at the United States as a whole.

35.     The "default" interchange fees have been established by Visa and MasterCard, respectively, on a national basis.  Similarly, the Competitive Restraints are specific to the United States and its territories.

36.     Plaintiff operated in 28 states during the Relevant Time Period, and the Competitive Restraints required NPC to accept, at all its locations throughout the United States, all cards of all issuing banks who are members of Visa or MasterCard at the "default" interchange fees set by those combinations.  The "Honor All Cards" Rules still compels Plaintiff to accept all cards of all issuing Visa and MasterCard members at the "default" interchange rates set by the Visa and MasterCard combinations, and the "No-Multi-Issuer" Rules furthermore prevent Plaintiff from benefiting from price competition among issuers that would result from issuers being able to issue payment cards capable of being processed on more than one network.

37.     Banks issuing credit and debit cards compete with one another to issue their cards to cardholders, who use those cards to buy goods or services from merchants.  This competition occurs in the markets for the issuance of credit cards and debit cards, which are not the relevant markets at issue in this action.  Card issuers earn income when cardholders select and use their credit and debit cards and when merchants accept those cards.  Issuing banks compete for

cardholders and card usage by offering a wide variety of credit card products, some of which offer features like cash back rebates, low interest rates, low (or no) annual fees, and rewards programs tied to usage. Cards that offer cash back, points or other usage benefits are typically called "rewards cards," and those rewards cards that offer the highest level of rewards to cardholders are referred to as "premium" cards; Visa's "Signature Preferred" and MasterCard's "World Elite" are examples of premium cards. Standard (or "traditional") credit cards – which do not offer the same range of features to cardholders – include products like Visa's "Traditional" card and MasterCard's "Core Value" card. Interchange fees for premium credit cards are higher than interchange fees merchants are charged for other rewards cards, which in turn are higher than the interchange fees merchants pay to accept standard credit card transactions. Yet due to the "Honor All Cards" Rules, merchants do not have the ability to refuse to accept rewards cards, even though they confer no benefit on the merchant.

38. The relevant product markets are: (1) the market for merchant acceptance of credit cards, and the sub-markets for (1a) merchant acceptance of Visa credit cards and (1b) merchant acceptance of MasterCard credit cards, and (2) the market for merchant acceptance of debit cards.

### A.   The Relevant Market for Merchant Acceptance of Credit Cards

39. Merchant acceptance of credit cards is a relevant product market. A credit card is not interchangeable with a debit card or other forms of legal tender such as cash or check. Many cardholders want the ability to access a line of credit, defer payment, or take advantage of other features offered by credit cards. For this reason, Plaintiff (and other merchants) could not stop accepting credit cards, even in the face of high or increasing interchange fees, without losing sales. The availability of debit cards and other forms of payment options (such as cash or checks) did not constrain Visa and MasterCard and their members in the charges they imposed for merchant acceptance of credit cards.

B.    The Relevant Sub-Market for Merchant Acceptance of Visa Credit Cards

40.   Merchant acceptance of Visa credit cards is a relevant sub-market of the relevant market for merchant acceptance of credit cards. Visa credit cards are not interchangeable with any other form of payment, including credit cards processed over a competing network such as MasterCard, Discover or American Express. In addition, Visa's rules require that merchants use Visa's networks to process all transactions using a Visa-branded credit card, and merchants cannot receive payment for a Visa transaction unless that transaction is processed over the Visa network.

C.    The Relevant Sub-Market for Merchant Acceptance of MasterCard Credit Cards

41.   Merchant acceptance of MasterCard credit cards is a relevant sub-market of the relevant market for merchant acceptance of credit cards. The court in the *Payment Card* Action upheld allegations that the market for merchant acceptance of MasterCard-branded credit cards was not interchangeable with merchant acceptance of other forms of payment, and that a separate market existed for merchant acceptance of MasterCard-branded credit cards. Among the allegations upheld in the *Payment Card* Action were that: MasterCard's rules required merchants to use MasterCard's network services to process all transactions involving a MasterCard-branded credit card; even in instances where a bank is both an issuer and an acquirer, merchants cannot receive payment for a MasterCard transaction unless that transaction is processed through the MasterCard network; and MasterCard barred its member banks from issuing payment cards (including, by necessity, credit cards) that process transactions through any kind of network's system in addition to transactions using MasterCard's network services. The same facts held true during the entire Relevant Time Period, and continue to hold true today.

D.   The Relevant Market for Merchant Acceptance of Debit Cards

42.   Merchant acceptance of debit cards is also a relevant product market.  Debit cards are not reasonably interchangeable with credit cards or other forms of legal tender such as cash or checks.  Because debit card transactions promptly withdraw funds from the cardholder's account (or, in the case of pre-paid cards, from the card balance), rather than allowing a grace period before billing and payment, they differ from credit card transactions in their utility to consumers.  These differences form the basis of the court's conclusion in *Visa Check* that "overwhelming evidence establishe[d]" that credit card transactions make up a separate market from the market for debit card transactions.

43.   Consumers who want to pay for a transaction with immediately-available funds may not want to carry large amount of cash (or checks for that matter – and not all merchants accept checks).  Consumers who cannot qualify for credit cards, or have reached the credit limit on their credit cards, may also prefer to use debit cards over other payment options.  As such, merchants could not stop accepting debit cards without risking lost sales.  Moreover, Visa, MasterCard and their member banks were not constrained in the charges they imposed for debit card acceptance by the availability of credit cards or other forms of legal tender such as cash or checks.

## VIII.   DEFENDANTS' COMBINATIONS AND CONSPIRACIES

A.   The Period Preceding the Corporate Restructurings of Visa and MasterCard

44.   Visa and MasterCard were, until relatively recently, owned and controlled by their member banks.  In 2006 and 2008, respectively, MasterCard and Visa each changed their ownership structures through initial public offerings ("IPOs"), a shift that allowed the member banks to partially divest their ownership of Visa and MasterCard.  The pre-IPO structures of defendants Visa and MasterCard were found to be consortiums of competitors – not single entities in the form of a traditional joint venture.  Executives of member banks which were among Visa's

21

largest issuers comprised a majority of Visa's board of directors until Visa's IPO on March 18, 2008, and executives of member banks which were among MasterCard's largest issuers comprised the majority of its board of directors until its IPO on May 25, 2006. The Visa and MasterCard boards of directors set the interchange fees paid by merchants.

45.   In *U.S. v. Visa*, the Second Circuit determined that the pre-IPO rules and bylaws of MasterCard and Visa constituted agreements among their member banks, and that the networks operated as structural conspiracies; the court affirmed that the network bylaws and rules constituted an unlawful horizontal agreement among the member banks. Indeed, no court has ever held that the networks' pre-IPO rules or bylaws did <u>not</u> constitute a conspiracy or agreement among the member banks, which is consistent with controlling law that rules and by-laws, as adopted by an association of competitors such as Visa and MasterCard's member banks, constitute an agreement.

46.   Each issuing bank was an independently-owned and –managed business; each bank was a separate economic actor pursuing its separate economic interests, and in other aspects of their business, member banks competed against one another. For example, as outlined above, issuing banks competed with one another for cardholders by creating payment card products that offered a variety of interest rates, annual fees, rewards and other features that made their cards more attractive to consumers than cards offered by other issuers.

47.   The member banks were competitors, yet contrary to their clear economic self-interest, they entered into membership agreements with Visa and MasterCard in which each member bank agreed to adhere to and enforce the rules and regulations of those associations. As members of the pre-IPO consortiums, the member banks agreed to a collection of restrictive rules – the Competitive Restraints – and agreed to impose those rules on merchants that accept Visa-

and MasterCard-branded payment cards. The Competitive Restraints eliminated competition among issuing banks for merchant acceptance, and similarly eliminated any chance that competition between the issuing banks could have allowed for separate terms of acceptance for the cards of each issuing bank. These Competitive Restraints eliminated the development of competitive markets for merchant acceptance.

48.    Evidence of acts contrary to an alleged conspirator's economic interests is indicative of a conspiracy – and it was contrary to a member bank's economic self-interest to have agreed to adopt the Competitive Restraints which prohibited merchants from: declining acceptance of any and all cards issued by competing member banks, surcharging its competitor's cards or discounting its own cards. For example, when a member bank – Citibank, for example – agreed to require merchants to accept all Visa cards, it prevented merchants from rejecting competing banks' Visa cards in favor of Visa cards that Citibank issued. When Citibank agreed to prevent merchants from discounting any card that was priced below a Visa card, it prevented merchants from favoring Citibank's own MasterCard-branded cards over other issuers' Visa cards by giving a discount to Citibank's MasterCard cardholders. The Competitive Restraints were identical or substantially the same for both Visa and MasterCard. The rules were agreed upon and enforced by supposedly competing banks who were members of Visa's board of directors and MasterCard's board of directors prior to those defendants' respective IPOs. These changes in corporate structure did not change the fundamental illegal agreements among Visa and its member banks, and among MasterCard and its member banks, to enforce the Competitive Restraints.

   B.   The Visa and MasterCard IPOs and the Continuation of their Combinations
        and Conspiracies Post-IPO

49.    MasterCard went public in 2006; Visa became public in 2008. The IPOs did not change the basic nature of the combinations and conspiracies alleged in this Complaint, or the

Competitive Restraints that resulted from those combinations and conspiracies.  The motivation for these IPOs was to limit the appearance that Visa and MasterCard were controlled by their member banks.  For example, the prospectus for MasterCard's 2006 IPO stated that "heightened regulatory scrutiny and legal challenges" spurred the decision to change MasterCard's ownership structure.  The prospectus went on to note that "many of the legal and regulatory challenges we face are in part directed at our current ownership and governance structure in which our customers – or member financial institutions – own all of our common stock and are involved in our governance by having representatives serve on our global and regional boards of directors."

50.   After the IPOs, neither Visa, MasterCard, nor any of their member banks took any affirmative action to withdraw from the respective combinations and conspiracies.  In fact, even after the IPOs, the member banks of Visa and MasterCard continued to agree to, and enforce and adhere to, the Competitive Restraints that eliminated competition among issuing banks for merchant acceptance.  Visa and MasterCard continued to establish "default" interchange fees for the benefit of their issuing bank members.  So even after the IPOs, Visa's and MasterCard's member banks maintained and enforced the Competitive Restraints – ensuring that, consistent with their historical practices, they did not compete for merchant acceptance.

51.   Each member bank agreed, in writing, with defendants Visa and/or MasterCard to impose the Competitive Restraints on merchants.  Both MasterCard and Visa participated in post-IPO horizontal conspiracies with their respective member banks, in which the banks agreed to adhere to, and impose, the Competitive Restraints.  The member banks remained separate entities and horizontal competitors.  Each bank continued to agree, in writing, to adhere to and enforce the Competitive Restraints, and neither the defendants, nor their co-conspirator member banks, withdrew from the combinations and conspiracies alleged here.

52.   As was the case before the IPOs, Visa and MasterCard served as facilitators and coordinators of horizontal agreements among their member banks to adhere to, and enforce, the payment of "default" interchange fees and the Competitive Restraints.  It would have been against the independent self-interest of any single issuing bank to have adhered to the Competitive Restraints without the agreement of the remaining issuing banks to also impose and adhere to those restraints.  By acting as the managers of their respective combinations and conspiracies, and coordinating agreements to continue imposing and adhering to the Competitive Restraints, Visa and MasterCard eliminated competition for merchant acceptance among their respective issuing banks.  But for the arrangements facilitated by Visa and MasterCard, the member banks would have pursued their own independent self-interest by competing for merchant acceptance of the cards they issued.

53.   The Competitive Restraints were promulgated pre-IPO, at a time when member banks controlled the networks' boards of directors, and each network was an adjudged structural conspiracy.  Post-IPO, the member banks continued to participate in horizontal agreements to impose the Competitive Restraints.  The IPOs caused the equity ownership of the two networks to change hands, but the operating entities remained essentially the same, and maintained the same type of membership rules that allowed the conspiracy to flourish before Visa's and MasterCard's respective public offerings.  Before and after the IPOs, a member bank had to execute a membership agreement.  The membership rules of both Visa and MasterCard required a given member to adhere to and enforce all of a network's rules and operating regulations.  The pre-IPO membership agreements did not terminate when the IPOs were implemented.  They constituted explicit, post-IPO agreements between Visa and its member banks, and MasterCard and its member banks, to the effect that the banks were to adhere to and impose the rules and regulations,

25

including, by necessity, the Competitive Restraints. The written membership agreements were not unilateral; they were signed bilateral agreements between Visa or MasterCard and their co-conspirator member banks – each of which knew that the other member banks were adhering to the same agreements.

54. Neither of the IPOs constituted withdrawals from the horizontal agreements. The restraints continued in effect and interfered in exactly the same manner with the price mechanism at the point of sale as they did before the restructurings. Post-IPO, there was a common understanding that all member banks had agreed to adhere to and enforce the Competitive Restraints. Visa or MasterCard were the hubs, and their member banks were the "spokes," of their illegal combinations. Visa's Operating Regulations and MasterCard's Rules both expressly required that each of its member banks enforce the Competitive Restraints. When a member bank agreed to be a Visa or MasterCard issuer or acquirer, it knew that its competitors would have likewise obligated themselves to enforce the Competitive Restraints. The ostensibly competing Visa and MasterCard banks, therefore, had a common understanding.

## IX.      THE EFFECTS OF THE COMPETITIVE RESTRAINTS

55. Despite the intense competition for cardholders, as described above, member banks did not compete for merchant acceptance of the cards they issued. Instead, after the IPOs, the member banks allegedly ceded to Visa and MasterCard the decision-making power with respect to the terms upon which they allowed merchants to accept the cards they issued. The Competitive Restraints, including the collective setting of "default" interchange fees, were not reasonably necessary to accomplish any legitimate, efficiency-generating objectives of the Visa and MasterCard combinations.

56. By continuing to agree to and adhere to the Competitive Restraints and the "default" interchange fees, after the IPOs, the member banks deprived the marketplace of independent

centers of decision-making and, as a result, of actual or potential competition in that marketplace. The Competitive Restraints, individually and in combination, eliminated issuing bank competition for merchant acceptance throughout the Relevant Time Period.  In the absence of these rules, the market for merchant acceptance would have been competitive.  Plaintiff and the issuing banks would have been able to gain the benefits of competition as to the terms under which Plaintiff would have accepted an issuing bank's payment cards.  Competition among issuing banks for merchant acceptance would have resulted in lower interchange fees for Plaintiff, which in turn would have allowed Plaintiff to enhance the value NPC's customers obtained from its goods and services.

57.    The following example is illustrative of the impact of the Competitive Restraints on the costs of merchant acceptance of credit and debit cards.  Once a customer presented a Visa credit card, the merchant could not invoke the price mechanism to steer the customer to a competing MasterCard credit card or another kind of Visa credit card (these are the effect of the "Honor All Cards" Rules, and to a certain degree, the "No-Multi-Issuer" Rules, which eliminate the possibility that a merchant could route a given transaction over whichever network might offer a more favorable interchange fee).  The merchant could not raise prices by surcharging the Visa credit card, nor could it lower the price to the customer by granting a discount to anyone who used one of the competing network's credit cards (the "No Discount" and "No Surcharge" Rules).  The merchant had no way to use price to favor, or disfavor, one network's credit card over another credit card.

58.    The Competitive Restraints prevented merchants from varying their retail prices depending upon the cost to the merchant of the payment means used by the shopper – causing some shoppers who used low-cost payment means to forgo some purchases that they otherwise

might have made because the merchant may have charged higher prices because of the cost of high interchange fees.

59.    In the absence of the Competitive Restraints, merchants could have used price signals to steer cardholders to lower cost payment methods, and MasterCard and Visa and their member banks would have had an incentive to lower their interchange rates.  There are real-world examples showing that, absent imposition of the Competitive Restraints, interchange fees would have declined, or would have otherwise been responsive to genuine competition.  In Australia, after the central bank there required Visa and MasterCard to remove their no-surcharge rules, Visa and MasterCard responded by lowering their interchange rates below regulated levels for merchants, who could then steer cardholders with price signals at the point of sale to pay with lower-cost payment methods.

A.    The Establishment of "Default" Interchange Fees

60.    Visa and MasterCard each established complex "default" interchange fee "schedules."  Interchange fees are not set to recover Visa's or MasterCard's costs of providing network services.  Rather, interchange is a fee that Visa and MasterCard, respectively, acting in combination with their issuing banks, required merchants to pay to the issuing banks.

61.    The member banks established, and Visa published, "default" interchange fees that are paid to its member banks, acting as the manager of its illegal combination and setting the price merchants pay for card acceptance.  Visa's "Core Principle" No. 10.3 states that "[i]nterchange reimbursement fees are determined by Visa and provided on Visa's published fee schedule, or may be customized where members have set their own financial terms for the Interchange of a Visa transaction or Visa has entered into business agreements to promote acceptance and card usage."  Upon information and belief, during the Relevant Time Period there was only one such

"customized" interchange fee schedule in place for a single merchant; all other merchants were subject to the Visa combination's "default" interchange fee schedules.

62. The member banks established, and, like Visa, MasterCard published, "default" interchange fees that are paid to its member banks, acting as the manager of its illegal combination and setting the price merchants pay for card acceptance. MasterCard's Rule 8.3 provides that "[a] transaction cleared and settled between Customers [*i.e.*, member banks] gives rise to the payment of the appropriate interchange fee or service fee, as applicable. [MasterCard] has the right to establish default interchange fees and default services fees (hereafter referred to as 'interchange fees' and 'service fees,' or collectively, 'fees'), it being understood that all such fees set by [MasterCard] apply only if there is no applicable bilateral interchange fee or service fee agreement between two [member banks] in place . . . [MasterCard] will inform [member banks], as applicable, of all fees it establishes and may periodically publish fee tables. Unless an applicable bilateral interchange fee or service fee agreement between two [member banks] is in place, any intraregional or interregional fees established by [MasterCard] are binding on all [members]." Upon information and belief, during the Relevant Time Period there was only one such "bilateral" interchange fee agreement in place for a single merchant; all other merchants were subject to the MasterCard combination's "default" interchange fee schedules.

63. Absent the Competitive Restraints, Plaintiff would have paid interchange fees for acceptance, if at all, as those fees would have been determined by competition among issuing banks for merchant acceptance. In the markets created by the Visa and MasterCard combinations, Visa and MasterCard, acting for their member banks, established interchange fee schedules for those member banks. Plaintiff was among the merchants injured by this collective setting of interchange fees by the Visa and MasterCard combinations.

B.   The Past (and Continuing) Effects of the "Honor All Cards" and "No-Multi-Issuer" Rules

64.   The "Honor All Cards" Rules require, in relevant part, that a merchant that accepts any Visa- or MasterCard-branded credit or debit card must accept all Visa- or MasterCard-branded credit or debit cards, no matter the card type (*i.e.*, "traditional" or "premium") and regardless of the bank that issued the card.  In a truly competitive market, the member banks who (prior to the networks' IPOs) sat on the Visa and MasterCard boards of directors would have adopted whatever rules to incentivize issuers to compete for merchant acceptance based on the price of interchange. But the market was not competitive, and the pre-IPO boards of Visa and MasterCard did the opposite:  in order to eliminate any incentive issuers might have had to compete for merchant acceptance based on the price of interchange, the Visa and MasterCard boards approved the Honor All Cards Rules, which require a merchant to accept all of a network's issuer's credit or all of a network's issuer's debit cards if they want to accept any such cards at all.  The "Honor All Cards" Rules also bar merchants from "steering" their customers from one issuer's card to another issuer's card (or any other kind of payment, for that matter).

65.   This kind of "take-it-or-leave-it" rule supports defendants' illegal combinations and conspiracies as follows.  By forcing merchants to accept all credit or debit cards bearing the network's brand, while disallowing steering, issuers do not fear losing business to a lower-cost competitor because all cards – by all issuers, regardless of how much interchange a merchant must pay to accept those cards – must be accepted at the "default" interchange rates determined by the Visa and MasterCard combinations.  Because of the Honor All Cards Rules, Plaintiff cannot reject any or all of the types of cards issued by any particular issuing bank.  Therefore, Plaintiff are precluded from gaining the benefits of competition as to the terms upon which they will accept (or reject) the cards of any issuing bank that is a member of Visa or MasterCard.

66.   If there were no "Honor All Cards" Rules, it would have been in the economic interest of an individual, profit-maximizing issuing bank to lower the price it charged in order to compete for merchants' business against other banks who issue similar cards.  But the "take-it-or-leave-it" "Honor All Cards" Rules do the opposite:  they eliminate the incentives to engage in such competition, and to lower interchange fees below the default "schedules" set by the member banks (at first) then (after the IPOs) established by Visa and MasterCard with the support of their member banks.  With the "Honor All Cards" Rules in place, it does not make economic sense for any issuer to compete on price because merchants are forced to accept that issuer's cards – even though they are being charged inflated rates for that privilege.

67.  The "No-Multi-Issuer" Rules operate in a similar way, by preventing price competition for merchant acceptance by disallowing any Visa- or MasterCard-branded payment card from being routed over a network of the merchant's choice.  Without the "No-Multi-Issuer" Rules, Plaintiff' customers would demand, and Visa- and MasterCard-issuing banks would issue, payment cards capable of being processed by more than one network.  Absent the "No-Multi-Issuer" Rules, member banks would compete for merchants on the price of acceptance – *i.e.*, the level of interchange fees – by offering lower interchange rates to spur the merchant to steer its customers to use the card issued by the member bank with the lowest interchange fees.  Instead, the "No-Multi-Issuer" Rules prevent this kind of price competition for merchant acceptance. While the Durbin Amendment promises to curtail the anti-competitive effects of the "No-Multi-Issuer" Rules in the market for merchant acceptance of debit cards, the anti-competitive effects of these rules continue to preclude price competition in the relevant market for merchant acceptance of credit cards (and the two relevant sub-markets for merchant acceptance of Visa-branded credit cards and merchant acceptance of MasterCard-branded credit cards).

C.   The Effects of the "All Outlets," "No Discount" and "No Surcharge" Rules
During the Relevant Time Period

68.   The "All Outlets" Rules required merchants who accepted Visa- or MasterCard-branded payment cards to accept those cards at all of their merchant locations, even if the location operated under a different trade name or banner.  A merchant was not allowed to accept the cards at some banners or trade names but not others.  These rules precluded merchants from gaining the benefits of competition as to the terms of acceptance (*e.g.*, by accepting certain cards at certain trade names but not others).

69.   Under the "No Discount" Rules, merchants were only allowed to offer discounts to customers who paid in cash, rather than using a different kind of payment card that might have imposed lower acceptance costs.  A merchant's inability to offer various discounts impeded the benefit of competition as to the terms of acceptance with an issuing bank.  All the major bank members of MasterCard were also members of Visa and vice versa.  It would have been contrary to the independent self-interest of a MasterCard issuer to prevent its merchant customers from offering discounts on Visa cards that the bank issued unless, of course, it was sure that its competitors would reciprocate and similarly prevent merchants from offering discounts even on cards they issued.  The horizontal price competition between MasterCard and Visa and their member banks at the point of sale was therefore eliminated.

70.   The "No Surcharge" Rules barred Plaintiff from surcharging transactions in which a cardholder used a Visa- or MasterCard-branded card.  These rules eliminated a merchant's ability to use surcharging as a tool in getting the benefits of competition as to the terms of acceptance with an issuing bank.  Absent these rules, a merchant could have surcharged a transaction in which a consumer used a card (like a "premium" credit card) that demanded a higher interchange fee**.**

## X.    MARKET POWER

71. There are significant barriers to entry into the market for credit cards. Indeed, the court in *U.S. v. Visa* specifically found that there are high barriers to entry into the credit card market. The Competitive Restraints prevented potential network competitors of Visa and MasterCard from using lower prices to enter, or expand their place in, the payment card business because merchants could not have used price signals to steer shoppers to the new entrant's lower-cost card. The difficulties associated with entering the network market were exemplified by the fact that no company has entered since Discover did in 1985. Discover has never obtained more than a seven percent share of the credit card market, and its current share of that market is roughly five percent. This was a direct consequence of the Competitive Restraints.

72. The Competitive Restraints prevented competitors from restraining defendants' interchange fees by taking transaction volumes from defendants' networks. The Competitive Restraints prevented retailers – including Plaintiff – from using price signals to steer shoppers to Discover, for example, in exchange for lower interchange fees.

73. The Competitive Restraints did not create defendants' market power, but they did (and in the case of the "Honor All Cards" and "No-Multi-Issuer" Rules, continue to) increase that power and prevent its erosion. The Competitive Restraints became a means of limiting price competition, thereby preventing the competitive erosion of the market power defendants had previously obtained.

A.    Visa's Market Power in the Market for Merchant Acceptance of Credit Cards and Visa's Market Power in the Sub-Market for Merchant Acceptance of Visa Credit Cards

74. During the Relevant Time Period, Visa and its issuing banks jointly had market power in the relevant market for merchant acceptance of credit cards in the United States and its territories. In *U.S. v. Visa*, the court found that Visa had market power in the market for merchant

acceptance of credit cards, with a 47 percent share of the dollar volume of credit card transactions in the United States.  In 2003, in *Visa Check*, a different court reaffirmed that Visa had market power in the market for merchant acceptance of credit cards, based on a finding that its market share fluctuated between 43 percent and 47 percent, coupled with a finding of substantial barriers to entry in the relevant product market.  Visa's share of the market for merchant acceptance of credit cards has not changed significantly since these two holdings.  The prior judicial findings of market power show that Visa had market power in the market for merchant acceptance of credit cards.

75.   Visa's conduct is direct evidence of its market power and that of its issuing banks. After its IPO, interchange fees were established by Visa on behalf of its issuing banks.  Visa continued to enforce the Competitive Restraints – first promulgated by its member banks in the pre-IPO period – which prevented competition among its issuing banks for merchant acceptance. Absent the Competitive Restraints, Visa's credit card issuing banks would have gained the benefits of competition as to the terms of merchant acceptance, including interchange fees, and Plaintiff would have benefitted through lower interchange fees and other benefits from competition.

76.   Moreover, Visa's market power is also demonstrated by its ability to discriminate in price among types of merchants, by distinguishing merchants by size, transactions by size, cards by type, and merchants by retail category.  Visa sets pricing tiers for different types of merchants, and has established different rates for general and premium credit cards.  Visa's most recent interchange fee "schedule" (published and effective on April 18, 2015) has over 50 different credit card interchange rates.

77.   Visa's market power in the market for merchant acceptance of credit cards is also shown by the fact that when the FRB significantly reduced the interchange fees on debit card

transactions, few (if any) merchants chose to stop accepting Visa credit cards, and Visa did not reduce its credit card interchange fees.  In 2012, the first full year after implementation of the mandated reduction of debit interchange rates, Visa credit card transactions and purchase volume increased.

78.   Competition with MasterCard did not eliminate Visa's exercise of market power in the market for merchant acceptance of credit cards.  During the period that Visa and MasterCard were both consortiums made up of their member banks, they adopted parallel rules that limited competition for merchant acceptance.  After their respective IPOs, Visa's and MasterCard's membership, rules and their power to extract high interchange fees from merchants have not changed, and continued to constrain competition between Visa and MasterCard and among the member banks of both combinations.

79.   Visa also has market power in the sub-market for merchant acceptance of Visa credit cards, as it is by definition the sole participant in that sub-market, with a market share of 100 percent.

B.   <u>MasterCard's Market Power in the Market for Merchant Acceptance of Credit Cards and MasterCard's Market Power in the Sub-Market for Merchant Acceptance of MasterCard Credit Cards</u>

80.   During the Relevant Time Period, MasterCard and its issuing banks jointly had market power in the relevant market for merchant acceptance of credit cards in the United States.  In *U.S. v. Visa*, the court held that MasterCard's 26 percent share of dollar volume of credit card transactions was sufficient to show that it had market power in the market for merchant acceptance of credit cards.  In a 2003 decision in *Visa Check*, a different court similarly held that MasterCard's 26 to 28 percent share of the market for merchant acceptance of credit cards was sufficiently high to go to a jury on the question of MasterCard's market power.  A 2008 decision in the *Payment*

*Card* Action upheld allegations that MasterCard's roughly 30 percent market share could (along with evidence of entry barriers and other factors) support a finding of monopoly power in the market for merchant acceptance of credit cards. MasterCard's share of the market for merchant acceptance of credit cards has not changed significantly since any of those decisions.

81. MasterCard's conduct is direct evidence of its market power and that of its issuing banks. After its IPO, interchange fees were increased by MasterCard on behalf of its issuing banks. MasterCard also continued to enforce the Competitive Restraints – originally promulgated by its member banks in the pre-IPO period – which prevented competition among its issuing banks for merchant acceptance. Absent the Competitive Restraints, Plaintiff would have benefitted through lower interchange fees and other benefits from competition.

82. In addition, MasterCard's market power is shown by its ability to discriminate in price among types of merchants, by distinguishing merchants by size, transactions by size, cards by type, and merchants by retail category. MasterCard sets pricing tiers for different groups of merchants, and has established different rates for general and premium credit cards. MasterCard's most recent schedule of interchange rates (effective April 17, 2015) includes nearly 100 different credit card interchange rates, varying by types of merchant and credit card type.

83. Competition with Visa did not eliminate MasterCard's exercise of market power in the market for merchant acceptance of credit cards. When Visa and MasterCard were consortiums made up of their member banks, they adopted rules that limited competition for merchant acceptance. After their respective IPOs, Visa and MasterCard's membership, rules and power to obtain high interchange fees from merchants did not change, and continued to constrain competition between Visa and MasterCard and among the members of both combinations.

84. MasterCard also has market power in the sub-market for merchant acceptance of MasterCard credit cards, as it is by definition the sole participant in that sub-market, with a market share of 100 percent.

C.   Defendants' Market Power in the Market for Merchant Acceptance of Debit Cards

85. The debit card market is dominated by Visa and MasterCard. Visa, jointly with its issuing banks, and MasterCard, jointly with its issuing banks, each exercised market power in the market for merchant acceptance of debit cards. Combined, Visa and MasterCard comprised about 75 to 80 percent of all debit purchase volume during the Relevant Time Period.

86. Visa and its issuing banks jointly have market power in the market for merchant acceptance of debit cards. Visa participated in and managed a combination made up of the bulk of debit-card issuing banks, such that merchants were unable to refuse to accept Visa-branded debit cards. This combination of issuing banks, coupled with the Competitive Restraints, gave Visa market power. Visa has exercised market power by requiring Plaintiff to pay supra-competitive interchange fees and by imposing the Competitive Restraints.

87. Visa's market power over merchants is shown by the fact that, when the tie forcing merchants to accept Visa debit cards as a condition of accepting Visa credit cards was discontinued in 2003 in the wake of the *Visa Check* settlement, there was no evidence that merchants were able to stop accepting Visa debit cards despite the availability of lower-cost PIN debit networks. Moreover, in 2011, the FRB found that Visa's debit interchange rates were significantly above cost. Because of Visa's Competitive Restraints, merchants cannot gain the benefits of competition among the issuing banks for terms of debit card acceptance.

88. MasterCard and its issuing banks jointly have market power in the market for merchant acceptance of debit cards. MasterCard participated in and managed a combination made

up of the bulk of debit-card issuing banks, such that merchants were unable to refuse to accept MasterCard-branded debit cards.    This combination of issuing banks, coupled with the Competitive Restraints, gave MasterCard market power.    MasterCard exercised market power by requiring Plaintiff to pay supra-competitive interchange fees and by imposing the Competitive Restraints.

89.   MasterCard's market power over merchants is shown by the fact that, when the tie forcing merchants to accept MasterCard debit cards as a condition of accepting MasterCard credit cards was discontinued in 2003 in the wake of the *Visa Check* settlement, there was no evidence that merchants were able to stop accepting MasterCard debit cards despite the availability of lower-cost PIN debit networks.   Moreover, in 2011, the FRB found that MasterCard's debit interchange rates were significantly above cost.   Because of MasterCard's Competitive Restraints, merchants could not gain the benefits of competition among the issuing banks for the terms of debit card acceptance.

## XI.      COMPETITIVE INJURY

90.   Visa and MasterCard used their market power to impose "default" interchange fees and the Competitive Restraints on NPC.

91.   The Competitive Restraints made it impossible for the Plaintiff to gain the benefits of competition as to the terms of acceptance, including lower interchange fees with individual issuing banks.   The Competitive Restraints gave issuing banks a mechanism to avoid competing for acceptance.   Absent the supra-competitive "default" interchange fees and the other Competitive Restraints, Plaintiff would have been able to gain the benefits of competition as to interchange fees, which would have reduced them to a truly competitive level.   The changes that were made to the Competitive Restraints because of the settlement of the *Visa Check* litigation and the federal government's enforcement actions against the networks (including *U.S. v. Visa* in the early 2000s

and the *U.S. v. American Express et al.* case brought in 2010) did not eliminate the market power of the Visa and MasterCard combinations, and did not curtail the levels of, or increases in, interchange fees being paid by merchants during the Relevant Time Period.

92.  NPC has been harmed by the actions of the Visa and MasterCard combinations.  The amount of interchange fees paid by NPC during the Relevant Time Period was supra-competitive. The high interchange fees imposed on Plaintiff led to increased prices for goods and services sold to consumers, or otherwise diminished the value Plaintiff's customers obtained from those goods or services.  As such, consumers, as well as merchants like Plaintiff, were harmed by the combinations' anti-competitive conduct, including the imposition of "default" interchange fees.

93.  If the Competitive Restraints did not exist, competition among issuing banks for merchant acceptance would have resulted in lower interchange fees.  NPC would have had the chance to use the strategies it used in other parts of its business or operations (*e.g.*, buying power) to obtain competitive acceptance terms.  But that was not the reality, and because of the Competitive Restraints, card acceptance was a significant cost to Plaintiff, and it had no ability to obtain lower interchange costs in a competitive market.

## XII.     CLAIMS FOR RELIEF

### A.  Count 1 Against Visa for Violation of Section 1 of the Sherman Act by Visa's Competitive Restraints Governing Credit Cards

94.  Plaintiff incorporates by reference the allegations in Paragraphs 1 through 93 as if fully set forth here.

95.  The use of credit cards issued by members of Visa, and the rules governing the use of such cards occurred in, and had a substantial effect on, interstate commerce.

96.  Visa and its member banks were a combination and conspiracy within the meaning of Section 1 of the Sherman Act.  Visa's rules and related contracts were agreements within the

meaning of Section 1 of the Sherman Act.  Visa's Competitive Restraints, as defined above, constituted horizontal agreements among Visa and its members both prior to and after Visa's corporate reorganization and IPO.  Visa implemented and served as the manager of a combination that limited competition among the bank members of the combination through the rules governing credit cards, which rules were agreed to by Visa members.  Accordingly, by these arrangements, Visa facilitated a horizontal agreement among its members, which members would have otherwise competed for merchant acceptance of the credit cards each member issued.  It would have been against the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, implemented and managed by Visa, similarly not to compete.

97.   In addition, Visa's rules and related contracts entered into before the Visa IPO constituted a horizontal agreement from which Visa and the member banks have never withdrawn. In changing its corporate form at the time of its IPO, Visa did not take any affirmative steps to end its existing anti-competitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members, or by taking any other steps to effectuate withdrawal from the rules and agreements.  Nor did any of Visa's members take any affirmative steps to withdraw from the rules and agreements.

98.   Alternatively, after the Visa IPO, the Competitive Restraints constituted vertical agreements in restraint of trade.

99.   Individually and in combination, the Competitive Restraints constituted an illegal agreement to fix the price of acceptance of Visa-branded credit cards, and to prevent the operation of, and interfere with, the competitive process with respect to the acceptance of Visa-branded credit cards, in violation of Section 1 of the Sherman Act.

100. Visa's "Honor All Cards" and "No-Multi-Issuer" Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks.  Under the "Honor All Cards" Rules, Visa gives merchants no choice but to accept Visa-branded cards from its issuing banks on a take-it-or-leave-it basis.  Each issuing bank's cards, though, are separate products that consumers choose based on competition among issuing banks in their variety of offerings of individual terms and characteristics of the cards.  The "Honor All Cards" Rules eliminate merchant acceptance as one of the points of competition among issuing banks.  By unlawfully forcing merchants to accept the Visa-branded credit cards of all issuing banks, the "Honor All Cards" Rules have the effect of fixing the price of acceptance paid by merchants.  But for the "Honor All Cards" Rules, competition among issuing banks for acceptance by merchants would lower the cost of accepting Visa-branded credit cards.  The "No-Multi-Issuer" Rules similarly prevent price competition among issuing banks for merchant acceptance of credit cards by preventing the issuance of Visa-branded credit cards that would also be capable of processing transactions over a competing network such as MasterCard (or Discover or American Express).  Such multi-issuer/multi-network credit cards would drive down the prices of merchant acceptance by allowing issuing banks to compete by lowering interchange fees to incentivize merchants to steer their customers to the network that offered the lowest costs of merchant acceptance.

101. Visa's setting of "default" interchange fees for the acceptance of Visa-branded credit cards further prevented the cost of acceptance from being determined between NPC and the various individual issuing banks in a competitive market.  Instead, Visa's supra-competitive interchange fees were established collectively by Visa in conjunction with, or after the IPO on behalf of, all of its member issuing banks.  Absent the setting of "default" interchange fees for Visa-branded credit

cards by Visa, and the other Competitive Restraints managed by Visa, issuing banks would have competed for acceptance by lowering the costs of acceptance of these cards for each issuer.

102. As alleged above, Plaintiff suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of credit cards by merchants, which were the direct result of Visa's Competitive Restraints.  The effect of these restraints was to increase the costs Plaintiff paid to accept Visa-branded credit cards, thereby injuring both Plaintiff and consumers through higher costs and decreased consumer welfare.

B.   Count 2 Against Visa for Violation of Section 1 of the Sherman Act by Visa's Competitive Restraints Governing Debit Cards

103. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 102 as if fully set forth here.

104. The use of debit cards issued by members of Visa and the rules governing the use of such cards occurred in, and had a substantial anti-competitive effect on, interstate commerce.

105. Visa and its member banks were a combination and conspiracy within the meaning of Section 1 of the Sherman Act.  Visa's rules and related contracts were agreements within the meaning of Section 1 of the Sherman Act.  Visa's Competitive Restraints, as defined above, constituted horizontal agreements among Visa and its members both prior to and after Visa's corporate reorganization and IPO.  After the corporate reorganization and IPO, Visa implemented and served as the manager of a combination that limited competition among the bank members of the combination through the rules governing debit cards, which rules were agreed to by Visa members.  Accordingly, by these arrangements, Visa facilitated a horizontal agreement among its members, which members would have otherwise competed for merchant acceptance of the debit cards each member issued.  It would have been against the independent self-interest of individual

issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, implemented and managed by Visa, similarly not to compete.

106. In addition, Visa's rules and related contracts entered into before the Visa IPO constituted a horizontal agreement from which Visa and the member banks have never withdrawn. In changing its corporate form at the time of its IPO, Visa did not take any affirmative steps to end its existing anti-competitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members, or by taking any other steps to effectuate withdrawal from the rules and agreements.  Nor did any of Visa's members take any affirmative steps to withdraw from the rules and agreements, or take any other steps to effectuate withdrawal from the rules and agreements.

107. Alternatively, after the Visa IPO, the Competitive Restraints constituted vertical agreements in restraint of trade.

108. Individually and in combination, the Competitive Restraints constituted an illegal agreement to fix the price of acceptance of Visa-branded debit cards, and prevented the operation of, and interfered with, the competitive process with respect to the acceptance of Visa-branded debit cards, in violation of Section 1 of the Sherman Act.

109. Visa's "Honor All Cards" Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks.  Under the "Honor All Cards" Rules, Visa gives merchants no choice but to accept Visa-branded cards from its issuing banks on a take-it-or-leave-it basis.  Each issuing bank's cards, though, are separate products that consumers choose based on competition among issuing banks in their variety of offerings of individual terms and characteristics of the cards.  The "Honor All Cards" Rules eliminate merchant acceptance as one of the points of competition among issuing

banks.  By unlawfully forcing merchants to accept the Visa-branded debit cards of all issuing banks, the "Honor All Cards" Rules have the effect of fixing the price of acceptance paid by merchants.  But for the "Honor All Cards" Rules, competition among issuing banks for acceptance by merchants would lower the cost of accepting Visa-branded debit cards.

110. Visa's setting of "default" interchange fees for the acceptance of Visa-branded debit cards further prevented the cost of acceptance from being determined between NPC and the various individual issuing banks in a competitive market.  Instead, Visa's supra-competitive interchange fees were set collectively by Visa in conjunction with, or after its IPO, on behalf of, all of its member issuing banks.  Absent the setting of "default" interchange fees for Visa-branded debit cards by Visa, and the other Competitive Restraints managed by Visa, issuing banks would have competed for acceptance by lowering the costs of acceptance of these cards for each issuer.

111. The maximum debit interchange fees established by the FRB did not eliminate the anti-competitive effects of the Visa combination's setting of "default" interchange fees.  Regardless of the ultimate fate of the FRB's rules, the damages Plaintiff suffered because of the imposition of supra-competitive debit interchange fees may be reduced by regulation, but such interchange fees that were imposed on Plaintiff by the Visa combination would have almost certainly been higher than they would be if there had been genuine, active competition for merchant acceptance.  As such, NPC suffered damages by being forced to pay supra-competitive interchange fees on Visa debit card transactions.

112. As alleged above, Plaintiff suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of debit cards by merchants, which were the direct result of Visa's Competitive Restraints.  The effect of these restraints was to increase the costs Plaintiff

paid to accept Visa's debit cards, thereby injuring both Plaintiff and consumers through higher prices and decreased consumer welfare.

C.   Count 3 Against Visa for Violation of Section 2 of the Sherman Act by Visa's
     Monopolization of the Market for Merchant Acceptance of Credit Cards

113. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 112 as if fully set forth here.

114. Visa had monopoly power in the relevant market for merchant acceptance of credit cards.

115. Visa unlawfully acquired, maintained and exercised monopoly power in the relevant market for merchant acceptance of credit cards.  Visa abused its monopoly power to impose on Plaintiff the Competitive Restraints, which had the purpose and effect of excluding competition from the relevant market.  The Competitive Restraints imposed by Visa made it impossible for potential competitors to enter the market for merchant acceptance of credit cards, which would have allowed potential competitors to offer lower interchange fees to Plaintiff.

116. As a direct and proximate result of Visa's exclusionary conduct, interchange fees were set at artificially-high levels, and Plaintiff suffered injury to its business and property by paying such high, supra-competitive interchange fees to accept credit cards.  Plaintiff's injury was the type the antitrust laws were designed to prevent, and flowed from that which made Visa's conduct unlawful.

117. There was no legitimate business justification for Visa's anti-competitive conduct. The anti-competitive effects of Visa's conduct outweigh any conceivable pro-competitive benefit or justification.  Moreover, even if such a justification had existed, any possible pro-competitive benefits could have been obtained by less-restrictive alternatives.  As such, Visa's monopolization

of the market for merchant acceptance of credit cards constituted a violation of Section 2 of the Sherman Act.

> D.  Count 4 Against Visa for Violation of Section 2 of the Sherman Act by Visa's Monopolization of the Sub-Market for Merchant Acceptance of Visa Credit Cards

118. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 117 as if fully set forth here.

119. Visa had monopoly power in the relevant sub-market for merchant acceptance of Visa-branded credit cards.

120. Visa unlawfully acquired, maintained and exercised monopoly power in the relevant sub-market for merchant acceptance of Visa-branded credit cards.  Visa abused its monopoly power to impose on Plaintiff the Competitive Restraints, which had the purpose and effect of excluding competition from the relevant sub-market.  The Competitive Restraints imposed by Visa made it impossible for potential competitors to enter the sub-market for merchant acceptance of Visa-branded credit cards, which would have allowed potential competitors to offer lower interchange fees to Plaintiff.

121. As a direct and proximate result of Visa's exclusionary conduct, interchange fees were set at artificially-high levels, and Plaintiff suffered injury to its business and property by paying such high, supra-competitive interchange fees to accept Visa-branded credit cards. Plaintiff's injury was the type the antitrust laws were designed to prevent, and flowed from that which made Visa's conduct unlawful.

122. There was no legitimate business justification for Visa's anti-competitive conduct. The anti-competitive effects of Visa's conduct outweigh any conceivable pro-competitive benefit or justification.  Moreover, even if such a justification had existed, any possible pro-competitive benefits could have been obtained by less-restrictive alternatives.  As such, Visa's monopolization

of the sub-market for merchant acceptance of Visa-branded credit cards constituted a violation of Section 2 of the Sherman Act.

E.   Count 5 Against MasterCard for Violation of Section 1 of the Sherman Act by MasterCard's Competitive Restraints Governing Credit Cards

123. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 122 as if fully set forth here.

124. The use of credit cards issued by members of MasterCard, and the rules governing the use of such cards occurred in, and had a substantial effect on, interstate commerce.

125. MasterCard and its member banks were a combination and conspiracy within the meaning of Section 1 of the Sherman Act.  MasterCard's rules and related contracts were agreements within the meaning of Section 1 of the Sherman Act.  MasterCard's Competitive Restraints, as defined above, constituted horizontal agreements among MasterCard and its members both prior to and after MasterCard's corporate reorganization and IPO.  MasterCard implemented and served as the manager of a combination that limited competition among the bank members of the combination through the rules governing credit cards, which rules were agreed to by MasterCard members.  Accordingly, by these arrangements, MasterCard facilitated a horizontal agreement among its members, which members would have otherwise competed for merchant acceptance of the credit cards each member issued.  It would have been against the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, implemented and managed by MasterCard, similarly not to compete.

126. In addition, MasterCard's rules and related contracts entered into before the MasterCard IPO constituted a horizontal agreement from which MasterCard and the member banks never withdrew.  In changing its corporate form at the time of its IPO, MasterCard did not

take any affirmative steps to end its existing anti-competitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members, or by taking any other steps to effectuate withdrawal from the rules and agreements. Nor did any of MasterCard's members take any affirmative steps to withdraw from the rules and agreements.

127. Alternatively, after the MasterCard IPO, the Competitive Restraints constituted vertical agreements in restraint of trade.

128. Individually and in combination, the Competitive Restraints constituted an illegal agreement to fix the price of acceptance of MasterCard-branded credit cards, and prevented the operation of, and interfered with, the competitive process with respect to the acceptance of MasterCard-branded credit cards, in violation of Section 1 of the Sherman Act.

129. MasterCard's "Honor All Cards" and "No-Multi-Issuer" Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to obtain the benefits of competition among individual issuing banks. Under the "Honor All Cards" Rules, MasterCard gives merchants no choice but to accept MasterCard-branded cards from its issuing banks on a take-it-or-leave-it basis. Each issuing bank's cards, though, are separate products that consumers choose based on competition among issuing banks in their variety of offerings of individual terms and characteristics of the cards. The "Honor All Cards" Rules eliminate merchant acceptance as one of the points of competition among issuing banks. By unlawfully forcing merchants to accept the MasterCard-branded credit cards of all issuing banks, the "Honor All Cards" Rules have the effect of fixing the price of acceptance paid by merchants. But for the "Honor All Cards" Rules, competition among issuing banks for acceptance by merchants would lower the cost of accepting MasterCard-branded credit cards. The "No-Multi-Issuer" Rules similarly prevent price

competition among issuing banks for merchant acceptance of credit cards by preventing the issuance of MasterCard-branded credit cards that would also be capable of processing transactions over a competing network such as Visa (or Discover or American Express).  Such multi-issuer/multi-network credit cards would drive down the prices of merchant acceptance by allowing issuing banks to compete by lowering interchange fees to incentivize merchants to steer their customers to the network that offered the lowest costs of merchant acceptance.

130. MasterCard's setting of "default" interchange fees for the acceptance of MasterCard-branded credit cards further prevented the cost of acceptance from being determined between NPC and the various individual issuing banks in a competitive market.  Instead, MasterCard's supra-competitive interchange fees were set collectively by MasterCard in conjunction with, or on behalf of, all of its member issuing banks.  Absent the setting of "default" interchange fees for MasterCard-branded credit cards by MasterCard, and the other Competitive Restraints managed by MasterCard, issuing banks would have competed for acceptance by lowering the costs of acceptance of these cards for each issuer.

131. As alleged above, Plaintiff suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of credit cards by merchants, which were the direct result of MasterCard's Competitive Restraints.  The effect of these restraints was to increase the costs Plaintiff paid to accept MasterCard's credit cards, thereby injuring both Plaintiff and consumers through higher costs and decreased consumer welfare.

F.   Count 6 Against MasterCard for Violation of Section 1 of the Sherman Act by MasterCard's Competitive Restraints Governing Debit Cards

132. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 131 as if fully set forth here.

133. The use of debit cards issued by members of MasterCard and the rules governing the use of such cards occurred in, and had a substantial anti-competitive effect on, interstate commerce.

134. MasterCard and its member banks were a combination and conspiracy within the meaning of Section 1 of the Sherman Act.  MasterCard's rules and related contracts were agreements within the meaning of Section 1 of the Sherman Act.  MasterCard's Competitive Restraints, as defined above, constituted horizontal agreements among MasterCard and its members both prior to and after MasterCard's corporate reorganization and IPO.  MasterCard implemented and served as the manager of a combination that limited competition among the bank members of the combination through the rules governing debit cards, which rules were agreed to by MasterCard members.  Accordingly, by these arrangements, MasterCard facilitated a horizontal agreement among its members, which members would have otherwise competed for merchant acceptance of the debit cards each member issues.  It would have been against the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, implemented and managed by MasterCard, similarly not to compete.

135. In addition, MasterCard's rules and related contracts entered into before the MasterCard IPO constituted a horizontal agreement from which MasterCard and the member banks have never withdrawn.  In changing its corporate form at the time of its IPO, MasterCard did not take any affirmative steps to end its existing anti-competitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members, or by taking any other steps to effectuate withdrawal from the rules and agreements.

Nor did any of MasterCard's members take any affirmative steps to withdraw from the rules and agreements.

136. Alternatively, after the MasterCard IPO, the Competitive Restraints constituted vertical agreements in restraint of trade.

137. Individually and in combination, the Competitive Restraints constituted an illegal agreement to fix the price of acceptance of MasterCard-branded debit cards, and prevented the operation of, and interfered with, the competitive process with respect to the acceptance of MasterCard-branded debit cards, in violation of Section 1 of the Sherman Act.

138. MasterCard's "Honor All Cards" Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks. Under the "Honor All Cards" Rules, MasterCard gives merchants no choice but to accept MasterCard-branded cards from its issuing banks on a take-it-or-leave-it basis. Each issuing bank's cards, though, are separate products that consumers choose based on competition among issuing banks in their variety of offerings of individual terms and characteristics of the cards. The "Honor All Cards" Rules eliminate merchant acceptance as one of the points of competition among issuing banks. By unlawfully forcing merchants to accept the MasterCard-branded debit cards of all issuing banks, the "Honor All Cards" Rules have the effect of fixing the price of acceptance paid by merchants. But for the "Honor All Cards" Rules, competition among issuing banks for acceptance by merchants would lower the cost of accepting MasterCard-branded debit cards.

139. MasterCard's setting of "default" interchange fees for the acceptance of MasterCard-branded debit cards further prevented the cost of acceptance from being determined between NPC and the various individual issuing banks in a competitive market. Instead, MasterCard's supra-

competitive interchange fees were set collectively by MasterCard in conjunction with, or on behalf of, all of its member issuing banks. Absent the setting of "default" interchange fees for MasterCard-branded debit cards by MasterCard, and the other Competitive Restraints managed by MasterCard, issuing banks would have competed for acceptance by lowering the costs of acceptance of these cards for each issuer.

140. The maximum debit interchange fees established by the FRB did not eliminate the anti-competitive effects of the MasterCard combination's setting of "default" debit interchange fees. Regardless of the ultimate fate of the FRB's rules, the damages Plaintiff suffered because of the imposition of supra-competitive debit interchange fees may be reduced by regulation, but such interchange fees imposed on Plaintiff by the MasterCard combination will almost certainly be higher than they would be if there were genuine, active competition for merchant acceptance.

141. As alleged above, Plaintiff suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of debit cards by merchants, which were the direct result of MasterCard's Competitive Restraints. The effect of these restraints has been to increase the costs Plaintiff pay to accept MasterCard's debit cards, thereby injuring both Plaintiff and consumers through higher prices and decreased consumer welfare.

G. Count 7 Against MasterCard for Violation of Section 2 of the Sherman Act by MasterCard for Monopolization of the Market for Merchant Acceptance of Credit Cards

142. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 141 as if fully set forth here.

143. MasterCard had monopoly power in the relevant market for merchant acceptance of credit cards.

144. MasterCard unlawfully acquired, maintained and exercised monopoly power in the relevant market for merchant acceptance of credit cards. MasterCard abused its monopoly power

to impose on Plaintiff the Competitive Restraints, which had the purpose and effect of excluding competition from the relevant market.  The Competitive Restraints imposed by MasterCard made it impossible for potential competitors to enter the market for merchant acceptance of credit cards, which would have allowed potential competitors to offer lower interchange fees to Plaintiff.

145. As a direct and proximate result of MasterCard's exclusionary conduct, interchange fees were set at artificially-high levels, and Plaintiff suffered injury to its business and property by paying such high, supra-competitive interchange fees to accept credit cards.  Plaintiff's injury was the type the antitrust laws were designed to prevent, and flowed from that which made MasterCard's conduct unlawful.

146. There was no legitimate business justification for MasterCard's anti-competitive conduct.  The anti-competitive effects of MasterCard's conduct outweigh any conceivable pro-competitive benefit or justification.  Moreover, even if such a justification had existed, any possible pro-competitive benefits could have been obtained by less-restrictive alternatives.  As such, MasterCard's monopolization of the market for merchant acceptance of credit cards constituted a violation of Section 2 of the Sherman Act.

H.    Count 8 Against MasterCard for Violation of Section 2 of the Sherman Act by MasterCard for MasterCard's Monopolization of the Sub-Market for Merchant Acceptance of MasterCard Credit Cards

147.  Plaintiff incorporates by reference the allegations in Paragraphs 1 through 146 as if fully set forth here.

148.  MasterCard had monopoly power in the relevant sub-market for merchant acceptance of MasterCard credit cards.

149.  MasterCard unlawfully acquired, maintained and exercised monopoly power in the relevant sub-market for merchant acceptance of MasterCard credit cards.  MasterCard abused its monopoly power to impose on Plaintiff the Competitive Restraints, which had the purpose and

effect of excluding competition from the relevant sub-market.  The Competitive Restraints imposed by MasterCard made it impossible for potential competitors to enter the relevant sub-market for merchant acceptance of MasterCard-branded credit cards, which would have allowed potential competitors to offer lower interchange fees to Plaintiff.

150. As a direct and proximate result of MasterCard's exclusionary conduct, interchange fees were set at artificially-high levels, and Plaintiff suffered injury to its business and property by paying such high, supra-competitive interchange fees to accept MasterCard-branded credit cards. Plaintiff's injury was the type the antitrust laws were designed to prevent, and flowed from that which made MasterCard's conduct unlawful.

151. There was no legitimate business justification for MasterCard's anti-competitive conduct.  The anti-competitive effects of MasterCard's conduct outweigh any conceivable pro-competitive benefit or justification.  Moreover, even if such a justification had existed, any possible pro-competitive benefits could have been obtained by less-restrictive alternatives.  As such, MasterCard's monopolization of the sub-market for merchant acceptance of MasterCard-branded credit cards constituted a violation of Section 2 of the Sherman Act.

I.   Count 9 Against all Defendants for Violations of State Antitrust and Unfair
Competition Laws

152.  Plaintiff incorporates by reference the allegations in Paragraphs 1 through 151 as if fully set forth here.

153. During the Relevant Time Period, NPC operated locations that accepted Visa- and MasterCard-branded credit and debit cards in the states whose antitrust or unfair competition laws are listed below.

154. By reason of the foregoing, defendants entered into agreements in restraint of trade, and/or engaged in anti-competitive practices, in violation of Florida Stat. Ann. § 501.201 *et seq.*

155. By reason of the foregoing, defendants entered into agreements in restraint of trade, and/or engaged in anti-competitive practices, in violation of Iowa Code Ann. § 533.1 *et seq.*

156. By reason of the foregoing, defendants entered into agreements in restraint of trade, and/or engaged in anti-competitive practices, in violation of Kansas Stat. Ann. § 50-101 *et seq.*

157. By reason of the foregoing, defendants entered into agreements in restraint of trade, and/or engaged in anti-competitive practices, in violation of Minnesota Stat. §§ 325D.49 *et seq.*

158. By reason of the foregoing, defendants entered into agreements in restraint of trade, and/or engaged in anti-competitive practices, in violation of Mississippi Code Ann. § 75-21-1 *et seq.*

159. By reason of the foregoing, defendants entered into agreements in restraint of trade, and/or engaged in anti-competitive practices, in violation of North Carolina Gen.  Stat. § 75-1 *et seq.*

160. By reason of the foregoing, defendants entered into agreements in restraint of trade, and/or engaged in anti-competitive practices, in violation of North Dakota Cent. Code § 51-08.1-01 *et seq.*

161. By reason of the foregoing, defendants entered into agreements in restraint of trade, and/or engaged in anti-competitive practices, in violation of Oregon Rev. Stat. §§ 646.705 *et seq.*

162. By reason of the foregoing, defendants entered into agreements in restraint of trade, and/or engaged in anti-competitive practices, in violation of South Dakota Codified Laws Ann.  § 37-1 *et seq.*

163. By reason of the foregoing, defendants entered into agreements in restraint of trade, and/or engaged in anti-competitive practices, in violation of Tennessee Code Ann. § 47-25-101 *et seq.*

164. By reason of the foregoing, defendants entered into agreements in restraint of trade, and/or engaged in anti-competitive practices, in violation of West Virginia Code § 47-18-1 *et seq.*

165. As a direct and proximate result of defendants' unlawful conduct, Plaintiff suffered injury to its businesses and property in these states, by paying supra-competitive interchange fees for acceptance of Visa- and MasterCard branded credit cards, and for acceptance of Visa- and MasterCard-branded debit cards.

## XIII.    DAMAGES

166. For the wrongful conduct described above, pursuant to 15 U.S.C. § 15(a), Plaintiff seeks to recover from the defendants the following damages:

    a.  Actual damages for acts and omissions occurring during the Relevant Time Period;

    b.  Treble damages on all actual damages found by the trier of fact;

    c.  Attorneys' fees;

    d.  Costs of this suit; and

    e.  Pre- and post-judgment interest at the maximum rate allowed by law.

Further, because their wrongful conduct was committed in combination as part of a conspiracy, the defendants should be jointly and severally liable for all damages found by the trier of fact.

## XIV.    DEMAND FOR JURY TRIAL

167. Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all disputed issues of fact in this matter.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A. Judgment in favor of NPC and against each defendant, in an amount to be determined at trial, including, but not limited to: compensatory damages; trebled damages; and pre- and post-judgment interest, as permitted by law;

B. Orders enjoining defendants from enforcing:

    1.  the "Honor All Cards" Rules as to both credit cards and debit cards;

    2. the "No-Multi-Issuer" Rules as to credit cards; and

    3. the "No-Multi-Issuer" Rules for debit cards, to the extent the FRB does not issue valid regulations that would provide Plaintiff with adequate prospective relief from defendants' continued imposition of the "No-Multi-Issuer" Rules in the market for merchant acceptance of debit cards.

C. An award of the costs of this suit, including reasonable attorneys' fees; and

D. Such other relief as the Court deems just, equitable and proper.

DATED: August 13, 2015

By: /s/ *Matthew P. McCahill*
Frederic S. Fox
Robert N. Kaplan
Donald R. Hall
Matthew P. McCahill
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, New York 10022
Tel: (212) 687-1980
Fax: (212) 687-7714
Email: ffox@kaplanfox.com
Email: rkaplan@kaplanfox.com
Email: dhall@kaplanfox.com
Email: mmccahill@kaplanfox.com

*Counsel for Plaintiff NPC International, Inc.*